# No. 19-16450

IN THE
## UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

**DANIEL M. COSTON,**
*Plaintiff-Appellant,*

*v.*

**ANDREW NANGALAMA; RONALD HALE, Licensed Vocational Nurse,**
*Defendants-Appellees.*

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF CALIFORNIA
MORRISON C. ENGLAND, JR., DISTRICT JUDGE · CASE NO. 2:10-CV-02009-MCE-EFB

## APPELLANT'S PRO BONO OPENING BRIEF

| | |
|---|---|
| **HORVITZ & LEVY** LLP | **KAYE, MCLANE, BEDNARSKI** |
| BARRY R. LEVY | **& LITT, LLP** |
| EMILY V. CUATTO | CAITLIN S. WEISBERG |
| 3601 WEST OLIVE AVENUE, 8TH FLOOR | 975 EAST GREEN STREET |
| BURBANK, CALIFORNIA 91505-4681 | PASADENA, CALIFORNIA 91106 |
| (818) 995-0800 | (626) 844-7660 |

**UCLA SCHOOL OF LAW**
**NINTH CIRCUIT APPELLATE ADVOCACY**
**PRISONERS' RIGHTS CLINIC**
AARON LITTMAN
ALBERTO DE DIEGO CARRERAS (CERTIFIED LAW STUDENT)
AMARIS MONTES (CERTIFIED LAW STUDENT)
385 CHARLES E. YOUNG DRIVE EAST
1242 LAW BUILDING, ROOM 3472
LOS ANGELES, CALIFORNIA 90095
(310) 825-9562

ATTORNEYS FOR PLAINTIFF-APPELLANT
**DANIEL M. COSTON**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................. v

INTRODUCTION ............................................................................................... 1

JURISDICTIONAL STATEMENT ..................................................................... 3

STATEMENT OF ISSUES PRESENTED ........................................................... 4

STATEMENT OF THE CASE ............................................................................. 5

    A.    Daniel Coston, a state prisoner, is prescribed morphine to treat chronic pain, but his medication is abruptly terminated when prison officials find pills in his cell. ............ 5

    B.    Coston initiates a civil rights action against prison physician Dr. Andrew Nangalama and prison nurse Randall Hale, challenging the abrupt termination of his medication and denial of follow-up care. During the first trial, the district court grants Defendants' Fed. R. Civ. P. 50 motion, but this Court vacates the judgment. ........ 9

    C.    On remand, the district court makes clear that the retrial will be limited in time and scope. ............................. 10

    D.    Nangalama testifies that he discontinued Coston's medication for medical and security reasons and that he believed Coston would not be harmed, but the court excludes the prison's medication policy that Coston sought to use to rebut that testimony. ................................. 11

    E.    Coston calls Hale as a witness, but the court excuses Hale shortly after the examination begins and requires Coston to proceed without his testimony. ........................... 13

    F.    The district court tells the jury that Hale is at his dying mother's bedside and Nangalama is treating the victims of nearby wildfires. ................................................... 15

i

G. Coston testifies that he had been taking the medication when delivered to him directly and that he did not receive treatment after it was discontinued. ........................ 17

H. After the district court instructs the jury to defer to prison officials' judgment in their adoption and execution of policies for maintaining security, the jury finds for Defendants. ............................................. 18

I. Coston moves for a new trial, arguing that he was prejudiced by the court's instructions and explanations to the jury, but the district court denies his motion. ........... 19

SUMMARY OF THE ARGUMENT ...................................................... 20

ARGUMENT ..................................................................................... 23

I. The district court erred in instructing the jury to defer to Defendants' alleged security justification for terminating Coston's morphine prescription. .................................................. 23

A. The deference instruction is appropriate only when security concerns genuinely clash with medical needs. ....... 23

B. The deference instruction was not appropriate here because there was insufficient evidence that Defendants were acting pursuant to a security-based policy or practice. ............................................................. 28

C. Even if there was evidence of a security rationale for the challenged medical care decisions, the deference instruction was still inappropriate because there was evidence that the decisions were an exaggerated response. ................................................................................ 31

D. The deference instruction was prejudicial because it acted as the equivalent of a directed verdict in favor of Defendants. .................................................................. 33

II. The district court abused its discretion by failing to continue the trial or grant a mistrial once Hale suddenly became unavailable to complete his testimony. ..........................................37

    A. While district courts have discretion to respond to sudden witness unavailability, they must actually exercise that discretion, and do so with restraint, where the witness's absence will impede a party's fundamental right to present his case..................................37

    B. The district court abused its discretion by not even considering a continuance to permit Coston to complete his examination of Hale. .......................................40

        1. A continuance should be granted where the risk of prejudice to a diligent party outweighs the inconvenience of a delay. ............................40

        2. Coston was severely prejudiced by being deprived of testimony that bore on the central controversies in the case. ...........................42

        3. Coston was diligent in preparing his case and a short delay would have caused relatively little inconvenience. ..........................................49

    C. Alternatively, the court should have granted Coston's motion for mistrial. ..........................................51

III. The district court abused its discretion by injecting irrelevant, sympathy-inducing information about Defendants into the trial..............................................53

    A. A trial court abuses its discretion where its comments to the jury reflect a biased disposition based on extrajudicial sources or improperly expose the jury to inadmissible evidence. .......................................53

B. The district court's comments to the jury regarding Hale's mother's demise and Nangalama's emergency response to victims of nearby wildfires were improper and prejudicial.............................................................54

IV. The district court erred when it excluded the prison's medication management policy as irrelevant..............................57

 A. Prison policies are highly relevant to Eighth Amendment claims.............................................................57

 B. Excluding the prison's policy prejudiced Coston in his ability to show why Defendants' actions were medically unsupported and an exaggerated response to any security concerns. ...............................................................58

V. While each of the above errors supports reversal, their cumulative effect irrevocably prejudiced Coston's ability, as a pro se litigant, to present his Eighth Amendment claim..............61

 A. A new trial is warranted where the cumulative effect of multiple errors impaired the fairness of the proceedings. ...............................................................61

 B. The combined effect of the instructional and evidentiary errors deprived Coston of a fair trial. ...............62

CONCLUSION ........................................................................64

STATEMENT OF RELATED CASES ....................................................65

CERTIFICATE OF COMPLIANCE.......................................................66

iv

# **TABLE OF AUTHORITIES**

**Page(s)**

## **Cases**

*Arcement v. GeoVera Specialty Ins. Co.,*
No. 13-5436, 2014 WL 12722065 (E.D. La. July 10, 2014) ................ 56

*Armant v. Marquez,*
772 F.2d 552 (9th Cir. 1985) ........................................................... 41

*Bautista v. Los Angeles County,*
216 F.3d 837 (9th Cir. 2000) ........................................................... 39

*Chess v. Dovey,*
790 F.3d 961 (9th Cir. 2015) ................................................... *passim*

*Clement v. Gomez,*
298 F.3d 898 (9th Cir. 2002) ........................................................... 25

*Cortez v. Skol,*
776 F.3d 1046 (9th Cir. 2015) ......................................................... 58

*Cunningham v. Bloxom,*
80 F. App'x 587 (9th Cir. 2003) ................................................. 55, 57

*Dietz v. Bouldin,*
136 S. Ct. 1885 (2016) ..................................................................... 38

*Farmer v. Brennan,*
511 U.S. 825 (1994) ......................................................................... 45

*Fenner v. Dependable Trucking Co.,*
716 F.2d 598 (9th Cir. 1983) ..................................................... 42, 49

*Fireman's Fund Ins. Co. v. Alaskan Pride P'ship,*
106 F.3d 1465 (9th Cir. 1997) ......................................................... 23

*Furnace v. Sullivan,*
705 F.3d 1021 (9th Cir. 2013) ......................................................... 58

*Gordon Mailloux Enters., Inc. v. Firemen's Ins. Co. of Newark,*
  366 F.2d 740 (9th Cir. 1966) ............................................................. 62

*Hansen v. Comm'r of Internal Revenue Serv.,*
  820 F.2d 1464 (9th Cir. 1987) ..................................................... 54, 55

*Harris v. Pate,*
  440 F.2d 315 (7th Cir. 1971) ............................................................. 49

*Hoard v. Hartman,*
  904 F.3d 780 (9th Cir. 2018) ............................................................. 36

*Hunt v. Rios,*
  690 F. App'x 476 (9th Cir. 2017) ..................................................... 62

*Hunter v. County of Sacramento,*
  652 F.3d 1225 (9th Cir. 2011) ........................................................... 33

*In re Hanford Nuclear Reservation Litig.,*
  534 F.3d 986 (9th Cir. 2008) ............................................................. 53

*Jerden v. Amstutz,*
  430 F.3d 1231 (9th Cir. 2005), *opinion amended on denial of reh'g*, No. 04-35889, 2006 WL 60668 (9th Cir. Jan. 12, 2006) ........................................................................................... 62

*Latiolais v. Whitley,*
  93 F.3d 205 (5th Cir. 1996) ............................................................... 38

*Maheu v. Hughes Tool Co.,*
  569 F.2d 459 (9th Cir. 1978) ............................................................. 54

*McCombs v. Pittsburgh-Des Moines Steel Co.,*
  426 F.2d 264 (10th Cir. 1970) ........................................................... 41

*Mendiola-Martinez v. Arpaio,*
  836 F.3d 1239 (9th Cir. 2016) .............................. 27, 28, 31, 35, 36

*Murphy v. City of Long Beach,*
914 F.2d 183 (9th Cir. 1990) .............................................................. 37

*North Indiana Public Service Co. v. Carbon County Coal Co.,*
799 F.2d 265 (7th Cir. 1986) .............................................................. 41

*Norwood v. Vance,*
591 F.3d 1062 (9th Cir. 2010) .............................................. 23, 24, 35

*Obrey v. Johnson,*
400 F.3d 691 (9th Cir. 2005) .............................................................. 33

*Scott v. Henrich,*
39 F.3d 912 (9th Cir. 1992) ................................................................ 58

*Shorter v. Baca,*
895 F.3d 1176 (9th Cir. 2018) ................................................... *passim*

*Sit-Set, A.G. v. Univ. Jet Exch., Inc.,*
747 F.2d 921 (4th Cir. 1984) .............................................................. 54

*Smith-Weik Mach. Corp. v. Murdock Mach. & Eng'g Co.,*
423 F.2d 842 (5th Cir. 1970) .............................................................. 40

*Taylor v. Soc. Sec. Admin.,*
842 F.2d 232 (9th Cir. 1988) .............................................................. 39

*Tennison v. Circus Circus Enters., Inc.,*
244 F.3d 684 (9th Cir. 2001) .............................................................. 57

*Tolbert v. Leighton,*
623 F.2d 585 (9th Cir. 1980) .............................................................. 39

*Ungar v. Sarafite,*
376 U.S. 575 (1964) ........................................................................... 41

*United States v. $11,500.00 in U.S. Currency,*
710 F.3d 1006 (9th Cir. 2013) ...................................................... 39, 51

*United States v. Barsoum,*
763 F.3d 1321 (11th Cir. 2014) ......................................................... 51

*United States v. Curtis,*
568 F.2d 643 (9th Cir. 1978)..............................................................58

*United States v. Dorsey,*
677 F.3d 944 (9th Cir. 2012)..............................................................52

*United States v. Drogoul,*
1 F.3d 1546 (11th Cir. 1993)..............................................................42

*United States v. Flynt*
756 F.2d 1352 (9th Cir. 1985)......................................... 40, 41, 42, 49

*United States v. Gallagher,*
743 F. Supp. 745 (D. Or. 1990)..........................................................53

*United States v. Garvey,*
693 F.3d 722 (7th Cir. 2012)..............................................................51

*United States v. Goode,*
814 F.2d 1353 (9th Cir. 1987)............................................................38

*United States v. Kloehn,*
620 F.3d 1122 (9th Cir. 2010)............................................................42

*United States v. Mejia,*
69 F.3d 309 (9th Cir. 1995)................................................................51

*United States v. Orlando,*
553 F.3d 1235 (9th Cir. 2009)............................................................41

*United States v. Pope,*
841 F.2d 954 (9th Cir. 1988)........................................................ 50, 51

*United States v. Pruett,*
788 F.2d 1395 (8th Cir. 1986)............................................................41

*United States v. Sowards,*
339 F.2d 401 (10th Cir. 1964)............................................................53

*United States v. Stephens,*
486 F.2d 915 (9th Cir. 1973)..............................................................57

viii

*United States ex rel. Bland v. Nenna,*
    393 F.2d 416 (2d Cir. 1968) ............................................................... 52

*United States ex rel. Gibson v. Ziegele,*
    479 F.2d 773 (3d Cir. 1973) ............................................................... 52

*Wade v. Hunter,*
    336 U.S. 684 (1949) ...................................................................... 51, 52

*Wagner v. County of Maricopa,*
    747 F.3d 1048 (9th Cir. 2013) ........................................................... 57

*Wells v. Rushing,*
    755 F.2d 376 (5th Cir. 1985) .......................................... 42, 47, 48, 50

## Constitutions

Unites States Constitution, amend. VIII ..................................... *passim*

## Statutes

28 U.S.C.
    § 1291 .............................................................................................. 3, 4
    § 1331 .................................................................................................. 3
    § 1343 .................................................................................................. 3
    § 1391(b) .............................................................................................. 3

42 U.S.C. § 1983 ................................................................................ 9, 47

## Rules

Fed. R. Civ. P. 50 ............................................................................ *passim*

Fed. R. Civ. P. 51(d)(2) ........................................................................ 35

Fed. R. Evid. 401 ........................................................................... 54, 58

Fed. R. Evid. 402 .................................................................................. 54

Fed. R. Evid. 403 .................................................................................. 54

Fed. R. Evid. 606 .................................................................................. 54

x

Fed. R. Evid. 606(b)(2)(A) ................................................................ 54, 58

**Miscellaneous**

Ninth Circuit Manual of Model Civil Jury Instructions § 9.27
(2017) ................................................................................ 18, 23, 26

Ninth Circuit Manual of Model Civil Jury Instructions § 9.27
cmt. (2017, revised Oct. 2019) ............................................... 19

# APPELLANT'S PRO BONO OPENING BRIEF

# INTRODUCTION

Daniel Coston, a California state prisoner, appeals from the second trial of a federal civil rights action in which he alleged that Defendants Dr. Andrew Nangalama and Nurse Randall Hale (collectively, Defendants) were deliberately indifferent to his medical needs. After pills were found in Coston's cell, Defendants abruptly terminated his morphine prescription, despite the risk of withdrawal, and allegedly failed to provide follow-up care. At the first trial, the district court granted Defendants' motion for judgment as a matter of law without giving Coston, a pro se plaintiff, adequate notice and opportunity to cure deficiencies. This Court vacated and remanded. On remand, the district court allowed the case to go to the jury but on a record so tainted by error that Coston was again deprived of a fair opportunity for the jury to decide his case.

First, the district court instructed the jury to defer to Defendants' asserted security justification for ending Coston's medication; namely, the need to prevent "hoarding" of the medication. However, this Court's precedent establishes that this instruction is inappropriate in medical

1

care cases where, as here, the challenged action was not tied to a bona fide security practice or policy and Defendants' response to their claimed security concern was exaggerated. At a minimum, the district court erred in failing to instruct the jury *not* to defer if it found that terminating the habit-forming medication without tapering or considering alternatives to avoid withdrawal and renewed pain was an exaggerated response to the security concerns.

Second, when Hale, one of the two Defendants and a material witness for Coston, suddenly became unavailable before Coston could complete his examination, the court denied Coston's motion for mistrial and did not even consider a continuance. Without Hale's testimony, Coston was deprived of the opportunity to provide testimony central to his affirmative case and his rebuttal of the defense.

Third, the court unnecessarily biased the jury in favor of Defendants by informing it that one Defendant was absent because he was treating the victims of a nearby fire and the other was absent to sit by the bedside of his dying mother. In a case about Defendants' deliberate indifference to the medical needs of others, this irrelevant, sympathetic information was highly prejudicial to Coston's case.

Finally, despite Defendants' insistence that their decision to discontinue Coston's medication was necessary as a security measure, the court did not allow Coston to introduce the prison's own policy about appropriate medical responses to noncompliant patients. Such evidence was relevant and admissible, and the error in excluding it prejudiced Coston's ability to show that the decision to terminate his prescription, rather than follow an alternative course, was deliberately indifferent.

Each of these errors individually supports reversal. Collectively, they leave no doubt that Coston was yet again deprived of a meaningful opportunity to prove that his rights were violated. This Court should reverse and remand so that Coston may finally receive a fair trial.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over Coston's civil rights action under 28 U.S.C. §§ 1331, 1343. Venue was proper in the Eastern District of California because the constitutional violations occurred in that district and all the parties resided in that district. *See* 28 U.S.C. § 1391(b).

On November 15, 2018, the district court entered its final judgment, over which this Court has jurisdiction under 28 U.S.C.

3

§ 1291. (1-ER-4.) In a prior order, this Court found that Coston's appeal was timely. (ECF No. 4.)

## STATEMENT OF ISSUES PRESENTED

1.      In this medical care case, did the district court err when it instructed the jury to defer to prison officials where the decision to terminate a prescription was not based on a bona fide security policy or practice, and where there was evidence that Defendants' response was exaggerated?

2.      Did the district court abuse its discretion by denying Coston's motion for mistrial and not even considering a continuance, despite the sudden unavailability of a defendant-witness whose testimony was central to Coston's case?

3.      Did the district court abuse its discretion in explaining to the jury that Defendants were absent because one was tending to his dying mother and the other was caring for the victims of nearby wildfires?

4.      Did the district court abuse its discretion in excluding the prison's medication management policy as irrelevant to Coston's claim when his rebuttal of Defendants' alleged security justification depended on showing that Defendants' actions were inconsistent with that policy?

5. Did the cumulative effect of the district court's errors deprive Coston of a fair trial?

## STATEMENT OF THE CASE

**A. Daniel Coston, a state prisoner, is prescribed morphine to treat chronic pain, but his medication is abruptly terminated when prison officials find pills in his cell.**

Daniel Coston is a fifty-seven-year-old man who was incarcerated at California State Prison-Sacramento (CSP-Sac). (2-ER-384–85, 491.) Coston has long suffered from a degenerative joint disease that causes him chronic pain in his back, foot, and left shoulder. (2-ER-384, 491–92.) On September 25, 2007, a CSP-Sac physician prescribed morphine to treat Coston's chronic pain. (2-ER-485–86.) On December 28, 2007, Defendant Nangalama refilled the prescription. (2-ER-487–89.)

Defendant Hale, a licensed vocational nurse at CSP-Sac, administered Coston's morphine. (1-ER-145, 153.) At CSP-Sac, morphine delivery requires "Direct Observation Therapy" ("DOT"), which means that the prisoner must be observed taking the medication by the nurse who delivers it and the correctional officer who escorts the

5

nurse. (2-ER-407–12.) Thus, according to Hale, he delivered the morphine personally and watched Coston take it. (1-ER-153.)

According to Coston, however, Hale often delivered the pills to his empty cell. (1-ER-173, 195–96; 2-ER-340.) Correctional Officer Dana Boggs confirmed that medical staff sometimes left medication in empty cells when inmates were out on the yard and that "[t]he nurse [he] dealt with most was Hale . . . [Hale] would be the one [he] would escort on the pill pass." (1-ER-195–96.)

On March 18, 2008, approximately one week after finding two pills taped inside a magazine that Coston gave him to deliver to another inmate, Boggs searched Coston's cell and found fifty morphine pills, which violated a prison policy against hoarding pills. (1-ER-170–71; 2-ER-518.) Boggs testified that the pills did not appear to have been degraded, (1-ER-195), which suggested that Coston was not hiding pills in his mouth and was thus consistent with Coston's account that Hale left pills in his empty cell. Prison officials acknowledged that there "does appear to be a failure of the DOT delivery method." (2-ER-517.)

6

The pills were confiscated, and Coston was formally disciplined by the prison. (2-ER-517–18.) He forfeited sentence credits, lost visiting privileges, and was required to undergo drug testing. (2-ER-518.)

In addition, Nangalama abruptly discontinued Coston's morphine prescription. (1-ER-92; 2-ER-384–85.) Hale documented and carried out that order. (1-ER-211; 2-ER-385.) Nangalama did not evaluate or examine Coston before (or even shortly after) discontinuing the medication. (1-ER-92–93, 101–02.) By all accounts, he did not see Coston again until more than three months later, on June 27, 2008. (1-ER-111–15, 202; 2-ER-530.)

Eleven days after Coston's medication was abruptly discontinued, a nurse found Coston on the floor of his cell near the toilet, heavily perspiring with vomit near his head, and he was taken to the prison emergency room. (2-ER-340.) His increased blood pressure, nausea, and vomiting were consistent with morphine withdrawal. (1-ER-102, 131.) Emergency room doctors treated his symptoms, but he was not given pain medication for his underlying condition. (1-ER-105; 2-ER-504.)

During the months that followed, Coston repeatedly communicated his continued pain to Defendants through several health

7

care requests, (2-ER-501, 512, 526, 528), in which he reported being in "severe," (2-ER-512), and even "debilitating" pain that prevented him from "sleep[ing] or function[ing] appropriately" after his medication was discontinued, (2-ER-528). He contends, however, that Hale and Nangalama ignored his consistent pleas for help. (*See, e.g.*, 1-ER-64 (explaining during his opening statement that Hale "was a gatekeeper" and disregarded his medical care requests, such that "none of [them] made it to the doctor"); 2-ER-313 (alleging that the day after his medication was discontinued he "verbally alerted" Hale "of his need for pain relief" but that Hale replied, "Yeah! You don't look well at all inmate Coston" and "laughed and walked away").)

8

**B.** **Coston initiates a civil rights action against prison physician Dr. Andrew Nangalama and prison nurse Randall Hale, challenging the abrupt termination of his medication and denial of follow-up care. During the first trial, the district court grants Defendants' Fed. R. Civ. P. 50 motion, but this Court vacates the judgment.**

On July 28, 2010, Coston filed a 42 U.S.C. § 1983 complaint against Nangalama and Hale.[1] (2-ER-305–06, 308.) Coston alleged that Nangalama and Hale were deliberately indifferent to his serious medical needs by abruptly terminating his morphine because it left him with untreated chronic pain and withdrawal symptoms. (2-ER-308, 312–13.) He further alleged that Nangalama failed to provide follow-up care after the discontinuation and that Hale knew of Coston's repeated requests for medical care yet disregarded them. (*See id.*)

The case went to trial for the first time on February 2, 2015. (2-ER-373–73.) Coston proceeded pro se, while Hale and Nangalama were represented by counsel. (*Id.*) When Coston rested, the court granted Defendants' Federal Rule of Civil Procedure 50 motion for judgment as a matter of law. (2-ER-374.) Thereafter, the district court denied

---

[1] While Coston named additional defendants, (2-ER-310), they were dismissed on a motion for summary judgment, (2-ER-355–56), and are not parties to this appeal.

Coston's posttrial motions, and Coston appealed, again pro se. (2-ER-375, 377.) This Court vacated and remanded for a new trial, holding that the district court erred by not giving Coston notice prior to dismissal or the opportunity to cure deficiencies. (2-ER-377–78.)

**C.    On remand, the district court makes clear that the retrial will be limited in time and scope.**

On remand, a jury trial was held on November 13 and 14, 2018. (1-ER-8, 180.) Coston once again proceeded pro se while Nangalama and Hale were represented by counsel. (*Id.*)

At the outset of the trial, the court told prospective jurors that it "determined that this case will be a relatively short case" and that "[i]t should take no more than two days, if that long." (1-ER-12.)

Throughout trial, the court repeatedly admonished Coston to stick to the two-day trial schedule when calling witnesses. (1-ER-144, 177.) In the interest of keeping to this predetermined schedule, the court repeatedly cabined Coston's questioning of witnesses, (1-ER-82–85, 160–62), instructed him on how to present his case, (1-ER-182–85), and limited the evidence presented to the jury, (1-ER-110–11, 119, 231).

### D. Nangalama testifies that he discontinued Coston's medication for medical and security reasons and that he believed Coston would not be harmed, but the court excludes the prison's medication policy that Coston sought to use to rebut that testimony.

Nangalama testified first. He explained that his decision to terminate Coston's morphine was motivated by medical and security concerns that arise when an individual does not take his medication as prescribed, such as medical complications, overdose, and the risk of other prisoners taking the medication. (1-ER-109, 129, 135.) However, he was unable to fully recall the prison's policy on medication management, which outlined the many other ways to remedy medication noncompliance. (1-ER-95; 2-ER-410–14.)

Coston attempted to introduce CSP-Sac's medication management policy into evidence. (1-ER-119.) This policy instructs medical personnel to administer narcotics like morphine through "Direct Observation Therapy" and indicates the proper protocol to address noncompliance, including directions to use alternative methods of dispersing medication when available. (2-ER-406–18.) However, the court excluded the policy as irrelevant. (1-ER-119.)

11

Nangalama acknowledged that someone receiving Coston's prescribed morphine dosage would become dependent. (1-ER-91.) He further acknowledged that terminating morphine abruptly "can cause harm to the patient," (1-ER-136), and stated that he would not usually "terminate [morphine] suddenly" without tapering a patient off the medication, (1-ER-106–07). But Nangalama denied having these concerns in Coston's case because, based on the pills found in his cell, he believed that Coston was not taking the medication. (1-ER-96, 114, 132–33.) He also believed Coston had access to other medications if he needed them. (1-ER-135–36.) However, he admitted that he did not see Coston or test his levels to check if he was taking his morphine before deciding to terminate it. (1-ER-101–02, 114–15.)

He also admitted that he did not even notify Coston when deciding to terminate the prescription nor did he follow up with him shortly after. (*See* 1-ER-101–02.) In fact, Nangalama confirmed that he did not see Coston again until June 27, 2008, almost three and a half months after he terminated the prescription. (1-ER-134.) Although he testified that he was not concerned because Coston had access to other providers and other medications, and that Coston did not suffer withdrawal

12

symptoms, (1-ER-135–38), this testimony was given without any apparent percipient knowledge, inasmuch as he admitted that he had not seen Coston during this period, (1-ER-101–02, 134), and did not specify any follow-up care that Coston actually received, (1-ER-93).

To show he did make medical care requests after Nangalama terminated his morphine, Coston attempted to introduce two written medical care requests, stating that he was in severe pain in his lower back and foot and needed further medical treatment. (*See* 1-ER 111, 231; 2-ER-512, 528.) The court excluded them on hearsay grounds. (1-ER-111, 231.)

At the conclusion of Nangalama's testimony, and per defense counsel's request, the court excused Nangalama and placed him "on-call" so that he could tend to the victims of nearby wildfires. (1-ER-142–44.)

### E. Coston calls Hale as a witness, but the court excuses Hale shortly after the examination begins and requires Coston to proceed without his testimony.

Coston next sought to offer Hale's testimony. However, twenty-one minutes into his direct examination, (*see* 2-ER-551), when Coston had covered little more than some preliminaries and the uncontested

13

discontinuation order, the court interrupted Hale's testimony and excused the jury, (1-ER-158). The court informed Hale that his family was trying to contact him because his mother was gravely ill. (1-ER-159.) After a brief recess, the court declared Hale unavailable, explaining out of the presence of the jury that he left to be with his mother who was a four-hour drive away. (1-ER-159–60.)

Coston moved for a mistrial. (1-ER-160.) Coston explained that "Mr. Hale is a vital witness" and that he was "not done with Mr. Hale." (*Id.*) The court stated that Hale had already testified about his role in the discontinuation of the medication. (*Id.*) But Coston explained that Hale was also vital to the period of time "*after* discontinuation." (1-ER-161 (emphasis added).) When the court pressed further, (1-ER-162), Coston began to respond, but the court interrupted and stated, incorrectly, that "what [Hale] did after th[e] date [of the discontinuation order] is irrelevant." (1-ER-162–63.)

Coston further explained that Hale's testimony was vital to address whether the pills found in his cell actually demonstrated that he was not taking his medication. (1-ER-163.) Coston stated that "the whole basis of [his] theory" was that the only pills he was not taking

14

were the ones that Hale delivered to his empty cell. (*Id.*) Because he would take the medication that was properly delivered to him in person, the decision to discontinue his medication was "rushed." (*Id.*) But rather than grant Coston's motion for mistrial or consider a continuance, the court instructed Coston to proceeded without Hale's testimony. (*Id.*)

### F. The district court tells the jury that Hale is at his dying mother's bedside and Nangalama is treating the victims of nearby wildfires.

When the jury returned, without notice to Coston or a request from defense counsel, the court explained: "Ladies and gentlemen of the jury, you will recall that Mr. Hale was on the witness stand just a moment ago before I excused you. . . . [T]he Court received an urgent phone call that stated that his mother was dying, and he has four hours to drive to get to his mother hopefully by this afternoon. So I have excused him from further testimony at this time because I do believe that that is something that he should be present for." (1-ER-164.) When the court adjourned for the day, defense counsel requested that the court also "tell the jury why Dr. Nangalama was not present," and the court agreed. (1-ER-178.)

15

The next morning, before the jury entered, defense counsel informed the court that Hale's mother passed away but that "[h]e made it for the last few hours." (1-ER-188.) The court responded that it would "let the jury know that as well and also that Dr. Nangalama is currently assisting [on] an emergency basis for the Camp Fire." (*Id.*) Coston asked: "You're going to let the jury know that?" (*Id.*) And the court replied: "It's just simply that. That he has been called away; So he won't be here." (*Id.*)

When the jury entered, the court did more than simply say Defendants were "called away." (*See* 1-ER-189.) Regarding Nangalama, the court said: "I want to explain the reason why he is not here is not that he doesn't care about the trial, but he is currently on-call in an emergency situation for the Camp Fire up north. Some of you may be aware of it and have family or friends involved in it, and we all see the smoke that's here in Sacramento; so that's where he is on duty right now." (*Id.*)

Regarding Hale, the court said: "Nurse Hale, as you know, was testifying, and I excused him to go because of his mother's illness, and

16

we've just been informed this morning that she did pass away last night, and he was able to make it there before she died." (*Id.*)

### G. Coston testifies that he had been taking the medication when delivered to him directly and that he did not receive treatment after it was discontinued.

Coston called himself as a witness. Coston testified that he took the medication every time it was delivered to him directly but that he did not take the medication when it was left in his cell because he did not receive his medication on a consistent basis and thus wanted to have it available. (1-ER-206–08.) Coston emphasized that there was no medical reason to end his morphine prescription because "[c]ustody had already punished [him] for the mistake [he made]" and he "took responsibility for what [he] did." (1-ER-203.)

Coston also testified that, contrary to Nangalama's testimony, he received no treatment after March 18, 2008, for his serious chronic condition. (1-ER-202.) Additionally, Coston stated that because he lived in the Administration Segregation Unit, he could only access medical providers ten to fourteen days after submitting a medical request, rather than twenty-four-seven, as Nangalama depicted. (1-ER-207.)

17

**H.    After the district court instructs the jury to defer to prison officials' judgment in their adoption and execution of policies for maintaining security, the jury finds for Defendants.**

At the jury instruction conference, the court identified Ninth Circuit Manual of Model Civil Jury Instructions § 9.27 (2017) (hereinafter Model Instruction 9.27) as the governing legal standard for the jury's analysis of Coston's Eighth Amendment claim.[2] (1-ER-250.) The pattern instruction contains bracketed language stating that "[i]n determining whether the defendant violated plaintiff's rights as alleged, you should give deference to prison officials in the adoption and execution of policies and practices that, in their judgment, are needed to preserve discipline and to maintain internal security." (1-ER-291.)

As to this portion of the instruction, Coston stated: "I have an objection." (1-ER-251.) Before Coston said anything else, the court asked the defense if they would like to be heard. (*Id.*) Defense counsel argued in response that it "is a standard instruction, and the plaintiff has not offered any evidence why under case law why--." (*Id.*) The court

_____

[2] The transcript erroneously refers to the instruction as Model Instruction No. 9.25. (1-ER-250.)

18

then interjected, "[i]t is a pattern instruction. It's what the Ninth Circuit has ruled on is appropriate; so the objection is overruled." (*Id.*)

Coston asked to be heard, but the court responded, "I think you already have been," even though Coston had not yet articulated the basis for his objection. (*Id.*) Coston responded, "Chase versus Dover [*sic*].[3] Ninth Circuit disagreed with medical cases. As far as that instruction included in the language of deference to the jury, I would have a continuing objection to this." (*Id.*) The court noted his objection but ultimately read the instruction to the jury. (1-ER 251, 291.)

The jury returned a general verdict in favor of Nangalama and Hale. (1-ER-4, 298–99.)

## I.      Coston moves for a new trial, arguing that he was prejudiced by the court's instructions and explanations to the jury, but the district court denies his motion.

Coston filed a posttrial motion to set aside the jury verdict, alter or amend the judgment, or for a new trial. (2-ER-560–61.) He argued

---

[3] Coston was clearly referring to *Chess v. Dovey*, 790 F.3d 961, 972 (9th Cir. 2015), (*see* 2-ER-562), cited in the commentary of the model instruction, Ninth Circuit Manual of Model Civil Jury Instructions § 9.27 cmt. (2017, revised Oct. 2019), though the name of the case appears to have been transcribed incorrectly.

19

three errors: (1) the deference language in the jury instruction was improper, (2-ER-562–63); (2) the district court's explanations to the jury regarding the absence of Defendants were improper and prejudicial, (2-ER-571–73); and (3) the jury's verdict was against the clear weight of the evidence, (2-ER-566–71). The district court denied the motion. (1-ER-7.) This appeal followed, and this Court appointed pro bono counsel. (3-ER-594.)

## SUMMARY OF THE ARGUMENT

1. The district court erred in instructing the jury to defer to Defendants' judgment in this case. The deference instruction is not appropriate in medical care cases, except in unusual circumstances where security concerns genuinely clash with medical needs. Even if there is an alleged security-based reason for the medical decision at issue, the instruction is still not appropriate where there is evidence that the response was exaggerated given the nature of the security issue. Here, Defendants did not base their decision to terminate Coston's medication on a security-based policy or practice. Even if security concerns were relevant to that decision, abruptly cutting off medication and not ensuring Coston had adequate follow-up care was

an exaggerated response. Thus, the instruction should not have been given. At the very least, additional language directing the jury not to defer if they found the response was exaggerated was necessary. This instructional error essentially directed a verdict for the defense.

2. The district court abused its discretion by not granting a continuance or mistrial in the wake of Hale's sudden unavailability. A continuance should have been granted because Hale was a material party witness whose conduct and state of mind were critical to Coston's case; Coston was a diligent litigant who never previously sought to delay trial; and a short continuance could have sufficed to accommodate both Hale and Coston. But the district court did not even consider a continuance. Because Coston's fundamental right to present his case was at stake, the court's failure to exercise its discretion was itself an abuse of that discretion. Alternatively, the court should have declared a mistrial because Coston's fundamental right to present his case far outweighed the costs incurred, since the issue arose on the first day of trial. By refusing to take any measure (or even *consider* all measures) to protect Coston's right to present evidence, the court again paved the way for a defense verdict.

21

3. The district court abused its discretion when it informed the jury that Hale was absent to take care of his dying mother and that Nangalama was absent to tend to the victims of a nearby wildfire. While some explanation regarding Defendants' absence may have been appropriate, giving the jury these sympathetic details served no legitimate purpose and was particularly prejudicial because the central issue in the case was Defendants' disposition towards the medical needs of others. The fact that the information came directly from the court made matters worse, as it lent judicial authority to the information.

4. The district court abused its discretion in excluding the medication management policy as irrelevant. This policy was not only relevant but critical to show that termination was not necessary for any security purpose. The policy's instructions for the administration of morphine—"Direct Observation Therapy" and alternatives in the event of noncompliance—would have completely prevented any hoarding or passing. Without this evidence Coston was hampered in his ability to show that Defendants' response to the pill incident was exaggerated.

22

5. While each of the aforementioned errors warrants reversal, their cumulative effect was to deprive Coston of a fair trial and direct the jury's verdict.

## ARGUMENT

**I.   The district court erred in instructing the jury to defer to Defendants' alleged security justification for terminating Coston's morphine prescription.**

**A.   The deference instruction is appropriate only when security concerns genuinely clash with medical needs.**

As part of its instruction regarding Coston's claim of deliberate indifference, the court told the jury that, "[i]n determining whether the defendant violated plaintiff's rights as alleged, you should give deference to prison officials in the adoption and execution of policies and practices that, in their judgment, are needed to preserve discipline and to maintain internal security." (1-ER-291.) Coston objected to this language (the "deference instruction"), so this Court's review is de novo. 1-ER-250–51; *see Fireman's Fund Ins. Co. v. Alaskan Pride P'ship*, 106 F.3d 1465, 1469 (9th Cir. 1997).

The deference instruction comes from Model Instruction 9.27 and is based on this Court's decision in *Norwood v. Vance*, 591 F.3d 1062

23

(9th Cir. 2010). In *Norwood*, a divided panel of this Court held that juries should be instructed to give deference in Eighth Amendment cases raising excessive force and conditions of confinement claims. 591 F.3d at 1067.

In *Chess v. Dovey*, however, this Court drew a clear line between excessive force and conditions of confinement claims on the one hand, and medical care claims on the other, explaining that "nothing in the reasoning of *Norwood* . . . leads [the Court] generally to require [a] deference instruction in medical care cases." 790 F.3d 961, 973 (9th Cir. 2015). Medical care cases are "different because 'the State's responsibility to attend to the medical needs of prisoners does not ordinarily clash with other equally important governmental responsibilities.'" *Id.* at 973 (citation omitted).

*Chess* did note that the deference instruction may be given in rare "outlier" medical care cases "when [a] policy or practice addresses bona fide safety and security concerns, and when there is evidence that the challenged medical decision was made pursuant to that security-based

24

policy or practice." *Chess*, 790 F.3d at 974.[4] By way of example, *Chess* pointed to *Clement v. Gomez*, 298 F.3d 898 (9th Cir. 2002), a case in which officers pepper-sprayed detainees to quell an altercation and left them and those in neighboring cells without treatment for multiple hours. *See Chess*, 790 F.3d at 974; *Clement*, 298 F.3d at 901-02. The instruction was properly given in that case because the emergency situation of the altercation "genuinely clash[ed]" with officials' ability to promptly provide medical care to affected prisoners. *Chess*, 790 F.3d at 974.

Outside of such "outlier" situations, however, the deference instruction should not be given in medical care cases because "decisions about medical care and policy are not ordinarily made in haste or under stress, unlike many decisions about the use of force or restrictive confinement." *Id.* at 973, 975 (holding that the deference instruction was improperly given where prison officials did not base their decision

---

[4] In *Chess,* this Court recognized that the Ninth Circuit stands apart in authorizing a deference instruction in *any* Eighth Amendment case, much less in medical care cases. *See Chess*, 790 F.3d at 972 n.1 (noting that, with one exception, "the deference language does not appear in any other circuit's model instructions for prisoner rights' claims").

to end the plaintiff's opiate medication on the specific security-based policy or practice identified in the record).

Moreover, even when defendants do tie their challenged actions to a security policy or practice, this Court's precedent makes clear that deference is inappropriate in *any* case—medical care or otherwise— "where the plaintiff produces substantial evidence showing that [such] policy or practice is an unnecessary, unjustified, or exaggerated response to the need for prison security." *Shorter v. Baca*, 895 F.3d 1176, 1183 (9th Cir. 2018).

*Shorter* addressed whether the deference instruction was appropriate in a prison case challenging cross-gender strip searches and shackling. *Id.* at 1187-88. Although the defendants asserted that their practice of chaining unclothed inmates to their doors while they were searched was justified by security concerns, this Court evaluated whether this was an "unwarranted," extreme response to the legitimate need to detect contraband. *Id.* at 1188-89. Because there was evidence that "alternative, less abusive means" were available in the prison's policies—such as isolating the prisoner in the restroom to obtain contraband or documenting incidences of contraband in their jail

26

recording system—this Court concluded that the practice was "unwarranted" and extreme, making the deference instruction inappropriate. *Id.*

*Shorter* acknowledged that this Court has, "at times, left it to the jury to decide whether deference to jail officials is warranted where there is a genuine dispute of material fact over whether the jail's policies or practices were unnecessary, unwarranted, or exaggerated." *Id.* at 1190. But in those cases, an additional instruction must also be given stating that the jury should *not* defer if the jury finds that the defendants' response was exaggerated. *Mendiola-Martinez v. Arpaio,* 836 F.3d 1239, 1257 (9th Cir. 2016).

In *Mendiola-Martinez,* a plaintiff challenged a jail policy that allowed her to be shackled while being transported to a hospital to give birth, as well as during postpartum recovery. *Id.* at 1254-56. In vacating a grant of summary judgment and remanding the case for trial, this Court directed the district court regarding the delivery of the deference instruction. *Id.* at 1257. It concluded that the case fell within the category of outliers described in *Chess* because it was a unique hybrid of medical care and conditions of confinement claims. *Id.* at 1254-55, 1257.

27

However, the Court also explained that a jury could find that shackling the plaintiff was an exaggerated response to the individualized threat that she posed. *Id.* at 1254-56. Therefore, the panel directed the trial court to provide the deference portion of the model jury instruction but also to "emphasize [to the jury] that the [defendants] are not entitled to deference if the jury finds that their response to any security or escape threat posed was 'exaggerated.'" *Id.* at 1257 (citation omitted).

As recognized by this Court, an erroneously given deference instruction profoundly impacts a prisoner plaintiff's case. It "deals a 'devastating blow' to the plaintiff's constitutional claims" and can essentially "command [that the jury] direct a verdict in favor of the government." *Shorter*, 895 F.3d at 1190 (citations omitted).

**B.  The deference instruction was not appropriate here because there was insufficient evidence that Defendants were acting pursuant to a security-based policy or practice.**

The deference instruction was inappropriate because Defendants identified no bona fide security-based reason to abruptly terminate Coston's morphine prescription and forego appropriate follow-up treatment.

28

Under *Chess*, the instruction is appropriate only when there is evidence that the specific "challenged medical decision" was made pursuant to a security-related policy or practice. 790 F.3d at 974. Defendants argued that stopping Coston's medication was necessary because hoarding medication raises security concerns. (1-ER-66 (accumulating pills, generally, is a "rules violation" or a "safety concern").)

However, there is a disconnect between their proffered security concerns and the action taken. Any security threats posed by the accumulation of pills were resolved by their removal from his cell—a nonmedical decision Coston does not challenge. Likewise, the prevention of future accumulation did not require, or even counsel in favor of, the abrupt termination of prescribed medication.

Defendants pointed to no prison policy suggesting otherwise. On the contrary, the CSP-Sac medication policy, which Coston sought to offer into evidence, instructs employees to respond to medication noncompliance with intermediate steps, such as counseling and administering medication in liquid form, prior to terminating prescriptions. *See* 2-ER-409–10, 412–14; *see also infra* Section IV. The

29

only policy in the record that refers to "hoarding" instructs providers to employ "Direct Observation Therapy"—the in-person delivery approach that Hale should have employed but allegedly failed to. (1-ER-173, 196; 2-ER-340, 408–09.)

Nor did Defendants present any evidence of any practice of stopping medication immediately after an individual is found to have pills in his cell. In fact, Nangalama testified to the contrary, stating that he would not usually stop a patient's morphine completely without tapering him off the medication. (1-ER-106–07.)

To the extent that Nangalama justified his deviation from this practice, it was based not on any purported security concerns but rather on the medical conclusion that Coston was no longer taking any of the morphine, so withdrawal would not occur—a conclusion seriously contested by Coston. (1-ER-114, 131–32, 200–01, 206.) Because Defendants failed to substantiate their claims that they discontinued Coston's medication based on security concerns, this medical care case is not one of the "outlier" cases where the deference instruction is appropriate.

30

**C.** **Even if there was evidence of a security rationale for the challenged medical care decisions, the deference instruction was still inappropriate because there was evidence that the decisions were an exaggerated response.**

Under *Shorter*, the deference instruction is inappropriate where there is "substantial evidence showing that the jail's policy or practice is an unnecessary, unjustified, or exaggerated response to the need for prison security." *Shorter*, 895 F.3d at 1183. Depending on the relative strength of that evidence, the deference instruction should either be omitted outright—as this Court concluded was appropriate in *Shorter*—or supplemented with an instruction for the jury not to defer if it finds that the defendant's response was unnecessary, unjustified, or exaggerated, as in *Mendiola-Martinez*. A prison official's response is exaggerated when there are "alternative, less abusive means" available to meet the security needs. 895 F.3d at 1188-89.

Here, even if there was evidence that Defendants needed to respond to a legitimate security concern, the evidence at trial also showed that their decision to abruptly end Coston's medication was exaggerated. To treat his chronic pain, Coston was prescribed morphine for more than a year at a dosage that Nangalama testified was

31

sufficient to make him reliant on this medication. (1-ER-91.) Although Hale and Nangalama identified Coston's retention of pills as a security concern, (1-ER-135, 155), the removal of the pills from Coston's cell addressed that concern.

Going forward, there was a straightforward means of avoiding further concerns: simply following the prison's policy requiring that Hale observe Coston taking the medication. After all, there was no evidence beyond mere speculation that Coston "cheeked" the pills; to the contrary, correctional officer Boggs affirmatively testified that he did not believe Coston cheeked pills. (1-ER-195.)

Another possible response, also directed by the policy, was to offer a different form of medication (such as liquid) to make hoarding impossible. But there is no evidence these alternatives were ever considered. Instead, Defendants chose the most extreme response: immediately stopping Coston's medication without tapering him off, despite the risk that he would suffer withdrawal and have unmanaged chronic pain. Halting the medication entirely, rather than taking simple steps to ensure he was taking it, was an exaggerated and unnecessarily abusive response to their security concerns.

32

Moreover, Coston also asserted that Defendants did not provide adequate (initially, any) pain management after they terminated his morphine, despite their knowledge that he suffered from a chronic illness requiring ongoing medication for pain. (1-ER-202–04.) The failure to ensure subsequent care was not responsive to any security threat and was necessarily an exaggerated response.

In sum, because Coston offered substantial evidence of an exaggerated response to the security issues, it was inappropriate to give the deference instruction at all. However, even to the extent the Court concludes that there were triable issues concerning whether Defendants' response was exaggerated, it was error to give the deference instruction without a supplemental instruction that the jury should not defer if it found Defendants' response was unnecessary, unjustified, or exaggerated.

### D. The deference instruction was prejudicial because it acted as the equivalent of a directed verdict in favor of Defendants.

Prejudice from instructional error is presumed. *See Obrey v. Johnson*, 400 F.3d 691, 699-701 (9th Cir. 2005); *Hunter v. County of Sacramento*, 652 F.3d 1225, 1235 (9th Cir. 2011). Defendants will not be

33

able to meet their burden of showing that the error was harmless. As noted, this Court has stated powerfully that the deference instruction deals a "devastating blow" to a plaintiff's Eighth Amendment claims and may "command to direct a verdict in favor of the government." *Shorter*, 895 F.3d at 1190 (citations omitted).

The instruction had such a profound effect here. It took from the province of the jury the key questions in this case: whether Defendants were deliberately indifferent by abruptly discontinuing Coston's morphine medication and whether their actions were justified, medically or otherwise. In effect, the jury was told that, even if Coston showed that Defendants were aware of and disregarded a substantial risk of serious harm, they were to find no liability if Defendants so much as purported that their actions were motivated by security concerns.

Rather than assessing the credibility and weight of Defendants' proffered justifications—which are questionable, for the reasons outlined here—the jury was told to accept them at face value. It was precluded from engaging in the "fact-intensive and context-dependent"

34

determination of whether Defendants' response was exaggerated and thus undeserving of deference. *Shorter*, 895 F.3d at 1189.

While some of this prejudice would have been cured had the district court also given the supplemental instruction prescribed in *Mendiola-Martinez*, the district court did not give the additional language, thus ensuring prejudicial error. *See Norwood*, 591 F.3d at 1067 (observing that "juries are not clairvoyant" and will not know to follow a particular legal principle "unless they are told to do so").

Defendants may argue that Coston did not specifically ask for the additional language or direct the court to cases requiring the additional language and that this Court should therefore review the failure to offer the additional instruction for plain error. *See* Fed. R. Civ. P. 51(d)(2). In fact, this Court should apply the ordinary, de novo standard of review in determining whether the district court erred by not supplementing the deference instruction, per *Shorter* and *Mendiola-Martinez*.

This Court in *Chess* held that it "will not punish a pro se litigant with plain error rather than de novo review," even if the pro se litigant does not offer a formal or specific objection "when the trial judge and defendants knew why the instruction might be erroneous and what the

35

objection would have been." *Chess*, 790 F.3d at 971. As a pro se plaintiff,

Coston's objection to the deference instruction (which appears in

bracketed language precisely to alert the court and litigants to the fact

that it may be inappropriate), along with his attempt to direct the court

to *Chess*, were sufficient to put the district court on notice that the

instruction, in the form proposed and absent a curative supplemental

instruction, was erroneous in a medical care case like his.

In any event, even if the plain error standard of review applies, it

is satisfied. Plain error exists when the error is obvious, affects

substantial rights, and seriously impairs the fairness of the

proceedings. *Hoard v. Hartman*, 904 F.3d 780, 787 (9th Cir. 2018).

The directions for Model Instruction 9.27 say clearly that the

"deference instruction should not be given in the ordinary Eighth

Amendment medical care case," and this Court's precedents in *Shorter*

and *Mendiola-Martinez* make clear that deference should not be given

to exaggerated responses. In the face of these authorities, it was an

obvious error for the court to give the instruction without, at least, also

directing the jury to consider whether Defendants' response was

exaggerated.

36

Further, as explained, this instruction was tantamount to a directed verdict, dooming any chance Coston had to prevail. By providing the deference instruction without any additional direction not to defer if Defendants' response was exaggerated, the court directed the jury to blindly rely on Defendants' decision to end Coston's medication based on the mere mention of a security-based rationale for their conduct. Put another way, the deference instruction, without the supplemental language, impaired Coston's substantial right to have the jury decide his central claim and seriously impaired the fairness of the proceedings.

**II.      The district court abused its discretion by failing to continue the trial or grant a mistrial once Hale suddenly became unavailable to complete his testimony.**

**A.      While district courts have discretion to respond to sudden witness unavailability, they must actually exercise that discretion, and do so with restraint, where the witness's absence will impede a party's fundamental right to present his case.**

While a district court necessarily has inherent and broad powers to control the litigation before it, *Murphy v. City of Long Beach*, 914 F.2d 183, 187 (9th Cir. 1990), these powers are constrained by a party's basic rights to a fair trial. *See, e.g., United States v. Goode*, 814 F.2d

37

1353, 1355 (9th Cir. 1987); *see generally Dietz v. Bouldin*, 136 S. Ct. 1885, 1893 (2016) ("Because the exercise of an inherent power in the interest of promoting efficiency may risk undermining other vital interests related to the fair administration of justice, a district court's inherent powers must be exercised with restraint."). Trial management decisions are reviewed for abuse of discretion. *Goode*, 814 F.2d at 1354.

In another prisoner civil rights suit, the Fifth Circuit stated that "[a]t a minimum, fundamental fairness requires that plaintiffs have the opportunity to present their cases so that the trier of fact can make a meaningful search for the truth." *Latiolais v. Whitley*, 93 F.3d 205, 207-08 (5th Cir. 1996) (holding that "district court's failure to weigh" the importance of prisoner's presence at trial "against the practical concerns of safety and expense" was error).

And this Court has held that, where a party's fundamental right to fair proceedings is at stake, a district court abuses its discretion if it does not actually exercise it by considering the appropriate factors and available options.[5] Here, when faced with the defendant-witness's

---

[5] *See, e.g., United States v. $11,500.00 in U.S. Currency*, 710 F.3d 1006, 1011-12 (9th Cir. 2013) (holding district court abused its discretion

sudden unavailability, the district court could have: (1) granted a continuance; (2) granted a mistrial; (3) required Hale to remain; or (4) compelled Coston to put an incomplete case to the jury.[6]

Requiring Hale to remain was not a reasonable option, given the seriousness of Hale's personal situation, but neither was compelling Coston to put an incomplete case to the jury, given the resulting prejudice against him. By not even considering the possibility of a continuance and by denying Coston's motion for mistrial, the district

---

when it struck party's procedurally defective claim without considering the factors that weighed against dismissal or alternatives like granting leave to amend); *Bautista v. Los Angeles County*, 216 F.3d 837, 841-42 (9th Cir. 2000) (holding district court abused its discretion when it dismissed complaint with prejudice because "there [was] no indication in the record that [the court] . . . considered any of [the relevant factors]" before making its decision); *Taylor v. Soc. Sec. Admin.*, 842 F.2d 232, 233 (9th Cir. 1988) (holding district court abused its discretion when it dismissed appeal for lack of subject matter jurisdiction because "[t]he [court's] order [did] not reflect whether [it] considered [the party's] request that her claim be transferred to the [proper court]"); *Tolbert v. Leighton*, 623 F.2d 585, 587 (9th Cir. 1980) (holding district court abused its discretion when it dismissed suit for failure to prosecute because there was no indication that the court considered alternative sanctions and thus it "failed to exercise any discretion in choosing among the alternatives").

[6] Allowing hearsay evidence in place of live testimony, a common response to unavailability, was not an option here because Hale had not been deposed.

39

court abused its discretion, as either option would have been reasonable and would have protected Coston's fundamental rights. *See Smith-Weik Mach. Corp. v. Murdock Mach. & Eng'g Co.*, 423 F.2d 842, 844 (5th Cir. 1970) (holding that a court abuses its discretion where "the interests in favor of a fair trial heavily outweigh[ ] the interests in favor of an immediate trial," but it opts for the latter).

**B.     The district court abused its discretion by not even considering a continuance to permit Coston to complete his examination of Hale.**

**1.     A continuance should be granted where the risk of prejudice to a diligent party outweighs the inconvenience of a delay.**

In *United States v. Flynt*, this Court articulated four factors for determining whether a trial court abused its discretion by not granting a continuance: (1) whether the complaining party was diligent in preparing his case; (2) whether a continuance would have been useful in meeting the need for which it was sought; (3) the extent to which a continuance would have inconvenienced the court, the parties, or the witnesses; and (4) the extent to which the complaining party was prejudiced by the trial court's decision. 756 F.2d 1352, 1358-59 (9th Cir.

40

1985).[7] While the *Flynt* factors provide useful guidance, this Court has made clear that it is "bound by no particular mechanical test." *Armant v. Marquez*, 772 F.2d 552, 556 (9th Cir. 1985). Instead, "[t]he answer must be found in the circumstances [of] every case." *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964).

When evaluating whether the failure to grant a continuance was an abuse of discretion, reviewing courts typically find reversible error where there is an element of suddenness or surprise—"changed circumstances to which a party cannot reasonably be expected to adjust without an extension of time," *North Indiana Public Service Co. v. Carbon County Coal Co.*, 799 F.2d 265, 269 (7th Cir. 1986), such as the sudden absence of a material witness. *See, e.g., United States v. Pruett*, 788 F.2d 1395, 1397 (8th Cir. 1986) (finding that death of father of material witness "militate[s] in favor of a continuance"); *McCombs v. Pittsburgh-Des Moines Steel Co.*, 426 F.2d 264, 265-66 (10th Cir. 1970)

---

[7] Although Coston did not specifically move for a continuance, he did object contemporaneously to proceeding with trial in Hale's absence. (1-ER-160.) Moreover, this Court may review the decision not to grant a continuance for abuse of discretion "even where, as here, no motion for continuance was made." *United States v. Orlando*, 553 F.3d 1235, 1237 (9th Cir. 2009).

(holding that failure to grant continuance was abuse of discretion where key witness became unavailable on eve of trial due to sudden ailment and hospitalization).

**2. Coston was severely prejudiced by being deprived of testimony that bore on the central controversies in the case.**

The prejudice to the aggrieved party is the most important of the *Flynt* factors. *See Flynt*, 756 F.2d at 1359. "[T]he focus of [the] prejudice inquiry is the 'extent to which the aggrieved party's right to present his [case] has been affected.'" *United States v. Kloehn*, 620 F.3d 1122, 1128 (9th Cir. 2010) (citation omitted). A party's right to present his case is affected where the trial court's decision to proceed with trial, despite the absence of a witness deprives the party of material testimony. *See, e.g., Wells v. Rushing*, 755 F.2d 376, 380-81 (5th Cir. 1985); *Fenner v. Dependable Trucking Co.*, 716 F.2d 598, 602 (9th Cir. 1983). Testimony is material where it bears on the central controversies in the case, *see Wells*, 755 F.2d at 380-81, and on a party's central theories at trial, *see United States v. Drogoul*, 1 F.3d 1546, 1553-54 (11th Cir. 1993).

Coston was severely prejudiced when the court decided to proceed with trial despite Hale's sudden unavailability. During the events in

42

question, Hale played a critical role at three junctures. *First,* he delivered Coston's morphine to him directly and allegedly also to his empty cell. (1-ER-153; 2-ER-312.) *Second*, he took and executed the discontinuation order. (1-ER-149–50). *Third*, he allegedly saw Coston after the morphine was discontinued, recognized that he was unwell, and disregarded his requests for medical care. (2-ER-313.) However, because Hale's testimony was cut short after a mere twenty-one minutes, Coston was only able to question him regarding the second and least disputed juncture. (1-ER-158; 2-ER-551.)

Near the end of trial, the court articulated some lingering questions: "[T]here's still certain factual issues that I have not heard and don't understand such as *how did you get the 50 pills*; *why were they there*; *why do you think that you had withdrawals, if you didn't take them . . . .*" (1-ER-218 (emphasis added).) Indeed, these were vital questions, and they were left unaddressed due to the absence of Hale's testimony—although certainly not for lack of effort from Coston.

Just when Coston turned to the subject of Hale's delivery of his morphine and the investigation regarding the pills in his cell, (1-ER-153), a barrage of twelve objections followed. (1-ER-153–58.) Despite

43

Coston being an untrained, pro se litigant, eleven of them were sustained. (*Id.*) Before ruling on defense counsel's thirteenth objection in five transcript pages, the court interrupted the testimony and excused the jury. (1-ER-158.)

When the court then declared Hale unavailable, Coston explained that Hale's testimony was vital to *how he got the 50 pills*, (1-ER-161), *why they were there*, (*id.*), and *why he had withdrawals*, (1-ER-162). The court rejected Coston's proffers and observed that Hale had already testified to the discontinuation, stating that "what [Hale] did after that date [was] irrelevant." (1-ER-163.) But Coston explained that, in fact, Hale's actions both before and after the discontinuation were also crucial. (1-ER-161.) He explained that testimony regarding Hale's delivery of his medication was crucial because the "whole basis of [his] theory" was that he was taking the medication when it was not left in his empty cell. (1-ER-163.) And consistent with his allegations that Hale ignored his subsequent requests for medical care, (2-ER-313), Coston explained that Hale's conduct "*after* discontinuation" was also crucial, (1-ER-161 (emphasis added)).

44

But even if Coston's offer of proof was less than perfectly clear, the reasons why Hale's testimony was crucial were not. First, and most obviously, Hale was a defendant, and his subjective knowledge was at issue. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994) (holding that deliberate indifference is a subjective standard). His testimony regarding central issues was thus uniquely valuable—who better (indeed, who else) to testify regarding Hale's knowledge than Hale himself?

Second, from the start of litigation and throughout trial, Coston's theories of liability made the importance of Hale's actions before and after the discontinuation readily apparent. In his complaint, trial brief, and at trial, Coston routinely alleged that Hale delivered pills to his empty cell. (1-ER-163; 2-ER-312, 394.) This was critical to Coston's case because it suggested that Hale knew that the mere presence of pills in his cell did not necessarily mean Coston was not taking the medication, especially when, at other times, Hale himself delivered the medication to Coston directly and watched him take it. (*See* 1-ER-153.) In turn, this would have suggested that Hale (1) knew that abrupt discontinuation would result in withdrawal and untreated pain yet disregarded those

45

risks and (2) was aware of a less extreme response that addressed Coston's medical needs as well as any security concerns: administering the medication in accordance with prison protocol rather than leaving pills in empty cells. (1-ER-176; 2-ER-410.)

As for his conduct after the discontinuation, Coston alleged in his complaint that Hale knew of his withdrawal symptoms and requests for medical care yet disregarded them, (*see, e.g.*, 2-ER-313), and during his opening statement at trial, he described Hale as a "gatekeeper" who received his requests and prevented them from reaching the doctors, (1-ER-64). But despite these repeated reminders of the reasons Hale was vital to Coston's theories of liability, the court insisted on proceeding without his testimony, leaving open the very questions it later recognized had gone unanswered.

These lingering issues were not just central to Coston's ability to present his affirmative case. They were also critical to rebutting the defense. For example, defense counsel repeatedly relied on the pills in Coston's cell as evidence that he must not have been taking his medication. (*See, e.g.*, 1-ER-213.) If the jury believed this, Coston's case was over—the jury would decide that the decision to terminate the

46

medication abruptly was (1) medically appropriate because Coston evidently did not need the medication nor would he suffer withdrawal and (2) necessary as a security measure because Coston was pretending to swallow pills in order to hoard them. Because the inferences arising from the pills in his cell were sufficient to dismantle his case altogether, rebutting this defense was at least as important as proving his affirmative case.

Faced with a similar situation, the Fifth Circuit in *Wells* held that the district court abused its discretion when it denied the plaintiff a continuance despite the defendant's absence at trial, where the defendant's missing testimony cut to the central issue in the case. 755 F.2d at 380. The plaintiff in *Wells* brought a 42 U.S.C. § 1983 action against a police officer who shot and killed her husband during a traffic stop. *Id.* at 377-78. "[T]he major controversy [at trial and on appeal] center[ed] around the [gun]" in the decedent's hand, as it made the difference between self-defense and excessive force. *Id.* at 378. The plaintiff alleged that the defendant had planted the gun, and the defendant denied it. *Id.*

47

The plaintiff intended to elicit testimony tying the defendant to the gun, *id.*, but the defendant did not appear for trial, and the district court denied the plaintiff's motion for a continuance, *id.* at 379-80. On appeal, the Fifth Circuit reversed, holding that because the gun was "the central issue in the case against [the defendant]," the plaintiff was deprived of material testimony. *Id.* at 380.

Here, the pills in Coston's cell were one of the major controversies at trial because the different possible inferences to be drawn from them bore on whether Defendants acted with deliberate indifference or in a medically appropriate manner. Thus, questioning Hale about his connection to the pills in Coston's cell was as central to Coston's case as questioning the defendant in *Wells* about his connection to the gun.

Without this testimony, the jury was bound to ponder the same lingering questions the court did, namely: how did Coston get the fifty pills, why were they in his cell, and why would he suffer pain or withdrawal from their abrupt discontinuation if he was not taking them in the first place? Left without Hale's answers to these questions, the jury unsurprisingly found for Defendants.

48

> **3. Coston was diligent in preparing his case and a short delay would have caused relatively little inconvenience.**

The remaining *Flynt* factors also weighed in favor of a continuance.

*First,* Coston was diligent. He never sought to delay trial prior to Hale's sudden unavailability—unlike Defendants, who sought (and were granted) multiple prior continuances, such as when Hale fell ill and when a defense witness was unavailable because of an upcoming vacation. (2-ER-358, 363–64, 368, 372.) And the mere fact that Coston did not secure Hale's testimony prior to trial did not make him any less diligent. Besides having limited means to depose witnesses due to his incarceration, Coston had every reason to expect that Hale would be present throughout trial. *See Fenner*, 716 F.2d at 602 (finding party was diligent, even though no prior testimony was obtained from missing witness, where it was reasonable to expect the witness to appear for trial); *see also Harris v. Pate*, 440 F.2d 315, 318 (7th Cir. 1971) (refusing to grant continuance so plaintiff could obtain affidavits was abuse of discretion where plaintiff was incarcerated and thus "less able than an ordinary party" to secure testimony).

Indeed, in addition to being a party defendant, Hale was listed as a witness on both Coston's and Defendants' witness lists, (2-ER-387, 398), and was in fact present at trial from jury selection until he was suddenly excused, (1-ER-8–158). *See Wells*, 755 F.2d at 380-81 (finding party was "well within the ambit of reasonableness" in expecting party defendant to appear for trial, especially where defendant was listed on both sides' witness lists and was present for jury selection).

*Second*, there is no reason to believe that a relatively short continuance would not have sufficed for Hale to return to complete his testimony, especially since the few parties and witnesses all appeared to be local. *Cf. United States v. Pope*, 841 F.2d 954, 957 (9th Cir. 1988) (holding that continuance sought on the first day of trial with jurors present would not have caused enough inconvenience to justify its denial, even where two government witnesses were from out-of-state). Yet the record reflects no attempt by the district court to determine how long a continuance would be necessary, much less the extent to which it would have inconvenienced the jurors, parties, and witnesses.

*Third*, a continuance would have also been "useful" because it would have "permit[ted Coston] to introduce evidence relevant to the

50

issue at hand." *United States v. Mejia*, 69 F.3d 309, 315 (9th Cir. 1995); *see also Pope*, 841 F.2d at 957 (noting that "[n]othing more [than relevance] should be required" to demonstrate that a delay in the proceedings would be useful).

Given the materiality of Hale's testimony to Coston's case, the district court abused its discretion by not even investigating whether a continuance would have been reasonable under the circumstances. *See U.S. Currency*, 710 F.3d at 1011 (holding that district court abuses its discretion when it fails to consider factors relevant to the exercise of that discretion).

## C. Alternatively, the court should have granted Coston's motion for mistrial.

A mistrial should be granted where an event at trial causes substantial prejudice that cannot be corrected, such that a fair trial is rendered impossible. *See United States v. Barsoum*, 763 F.3d 1321, 1340 (11th Cir. 2014); *United States v. Garvey*, 693 F.3d 722, 726 (7th Cir. 2012). The unexpected absence of a material witness is such an event. *See Wade v. Hunter*, 336 U.S. 684, 690-91 (1949). A district court's refusal to declare a mistrial is reviewed for abuse of discretion. *United States v. Dorsey*, 677 F.3d 944, 954 (9th Cir. 2012).

51

Here, to the extent the district court assumed that granting a continuance was not an option because it would have too seriously inconvenienced the jurors and parties (to whom the court had promised no more than a two-day trial), a mistrial was the next best option to address the unfair prejudice to Coston stemming from Hale's sudden unavailability. *See* discussion *supra* Section II.B.2. While there would have been some inconvenience and waste of judicial resources in declaring a mistrial, it would have been minimal, given that less than a day of trial had elapsed. Coston's fundamental right to present his case far outweighed these costs.

Even in the criminal context—where a defendant's constitutionally protected right not to be prosecuted twice for the same crimes is at stake—courts have concluded that the prejudice to the prosecution from the sudden absence of a key witness outweighs the defendant's right to avoid double jeopardy, warranting a mistrial. *See, e.g., Wade*, 336 U.S. at 689; *United States ex rel. Gibson v. Ziegele*, 479 F.2d 773, 775 (3d Cir. 1973); *see also United States ex rel. Bland v. Nenna*, 393 F.2d 416, 416 (2d Cir. 1968); *United States v. Gallagher*, 743 F. Supp. 745, 749 (D. Or. 1990). If a mistrial is appropriate under

52

those circumstances, it is even more appropriate in a civil case like this one, in which Defendants have no constitutional right to avoid multiple trials.

Because Coston's right to a fair trial was at stake, and the inconvenience of declaring a mistrial did not outweigh the prejudice he suffered, a mistrial should have been granted.

## III. The district court abused its discretion by injecting irrelevant, sympathy-inducing information about Defendants into the trial.

### A. A trial court abuses its discretion where its comments to the jury reflect a biased disposition based on extrajudicial sources or improperly expose the jury to inadmissible evidence.

"The right of a trial judge to comment . . . has its limitations. . . . The influence of the trial judge on the jury 'is necessarily and properly of great weight' and 'his lightest word or intimation is received with deference, and may prove controlling.'" *United States v. Sowards*, 339 F.2d 401, 403 (10th Cir. 1964) (citation omitted).

Comments by a district court are reviewed for abuse of discretion, *In re Hanford Nuclear Reservation Litig.*, 534 F.3d 986, 1015 (9th Cir. 2008), and require reversal where they "reflect[ ] a [biased] disposition, based on extrajudicial sources," *Hansen v. Comm'r of Internal Revenue*

53

*Serv.*, 820 F.2d 1464, 1467 (9th Cir. 1987), or where they characterize evidence with an implied judicial imprimatur, *see Maheu v. Hughes Tool Co.*, 569 F.2d 459, 472 (9th Cir. 1978). Regardless of the source, a jury must not be exposed to extraneous, irrelevant information that is highly prejudicial. *See* Fed. R. Evid. 401, 402, 403, 606(b)(2)(A); *see also* 1-ER-293–94 (instructing the jury that they "must not be exposed to any other information about the case or the issue it involves" nor "do any research about . . . the people involved including the parties").

A "boilerplate final instruction to jury" that fact-finding is their domain does not automatically cure the error. *Sit-Set, A.G. v. Univ. Jet Exch., Inc.*, 747 F.2d 921, 926 (4th Cir. 1984).

**B. The district court's comments to the jury regarding Hale's mother's demise and Nangalama's emergency response to victims of nearby wildfires were improper and prejudicial.**

The district court's explanations to the jury regarding Defendants' absence at trial constitute reversible error because they exposed the jury to irrelevant outside information that was highly prejudicial to Coston, especially because it carried a judicial imprimatur. *See* Fed. R. Evid. 403, 606; *Cunningham v. Bloxom*, 80 F. App'x 587, 590 (9th Cir. 2003); *Hansen*, 820 F.2d at 1467.

54

While some explanation of Defendants' absence was permissible to avoid prejudice to Defendants, the court could have simply stated that Defendants had to leave due to unforeseen circumstances and that the jurors were not to draw any adverse inferences from their absence. Instead, the court divulged that Hale was absent because "his mother was dying, and he ha[d] four hours to drive to get to [her]." (1-ER-164.)

The next morning, having *already* explained to the jury the reason for Hale's absence, the court gave the jury an update: "[Hale's mother] did pass away last night, and he was able to make it there before she died." (1-ER-189.) This additional detail was entirely unnecessary and served only to bias the jurors in Hale's favor—having just heard that his mother passed, the jury would be reluctant to add insult to injury by reaching a verdict against him.

The court also explained to the jury why Nangalama was absent. (*Id.*) Not only did the court specify that he was away because of the high-profile "Camp Fire up north," which alone would elicit anyone's sympathies, it also added: "Some of you may . . . have family or friends involved in it, . . . so that's where he is on duty right now." (*Id.*) It is difficult to imagine how this gratuitous commentary could not have

55

biased the jury in favor of the Defendant. In effect, the jurors were told that a finding in Coston's favor would impose liability and damages on a man who was, at that moment, saving the lives of *their* loved ones.

But this information did more than simply bias the jurors. In a case about Defendants' deliberate indifference towards the medical needs of another, knowing that one Defendant left trial to tend to the emergency victims of a raging wildfire and the other left trial to be at the bedside of his dying mother effectively constituted character evidence about their propensity to be caring and attentive to the needs of others. The court's statements thus allowed information to come before the jury which, if offered by defense counsel through a witness or exhibit, would have been plainly inadmissible. *See, e.g.*, *Arcement v. GeoVera Specialty Ins. Co.*, No. 13-5436, 2014 WL 12722065, at *3 (E.D. La. July 10, 2014) (finding that testimony regarding party's rescue efforts during recent natural disaster was inadmissible character evidence that "would run a high risk of distracting the jury"). Moreover, the prejudice here was amplified because the jury heard this evidence directly from the most credible authority: the court itself. *See Cunningham*, 80 F. App'x at 590 (vacating jury verdict where "jurors

56

heard . . . one-sided description of the expected evidence with an implied judicial imprimatur").

An error so prejudicial could not have been cured by a generic instruction that the jury should refrain from drawing inferences about the court's opinion from "anything [it has] said or done," (1-ER-285), especially when it was not given at the time the comments were actually made but rather buried amidst other generic instructions at the end of trial. *See, e.g.*, *United States v. Stephens*, 486 F.2d 915, 917 (9th Cir. 1973).

## IV. The district court erred when it excluded the prison's medication management policy as irrelevant.

### A. Prison policies are highly relevant to Eighth Amendment claims.

Evidentiary decisions are reviewed for abuse of discretion. *See Wagner v. County of Maricopa*, 747 F.3d 1048, 1052 (9th Cir. 2013). The erroneous exclusion of evidence is grounds for reversal where the error was prejudicial. *See Tennison v. Circus Circus Enters., Inc.*, 244 F.3d 684, 688 (9th Cir. 2001).

"Evidence is relevant if (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the

57

fact is of consequence in determining the action." Fed. R. Evid. 401. This is a very low bar. *See, e.g.*, *United States v. Curtis*, 568 F.2d 643, 645 (9th Cir. 1978).

Prison policies are relevant to analyzing Eighth Amendment claims because they help frame whether officials were acting according to the basic standards of care of the prison. *See Cortez v. Skol*, 776 F.3d 1046, 1052 (9th Cir. 2015) (holding that the fact that a written policy about leg irons existed supported the notion that residents were at risk without them); *Furnace v. Sullivan*, 705 F.3d 1021, 1027-28 (9th Cir. 2013) (holding that prison policies governing restraint during a disturbance were relevant to deciding whether the plaintiff's Eighth Amendment claim regarding such restraint was successful); *Scott v. Henrich*, 39 F.3d 912, 915-16 (9th Cir. 1992) (finding that guidelines are relevant in an analysis of excessive force because "one of the[ ] purposes [of the policy] is to protect the individual against whom force is used").

**B.** **Excluding the prison's policy prejudiced Coston in his ability to show why Defendants' actions were medically unsupported and an exaggerated response to any security concerns.**

The district court abused its discretion by excluding relevant CSP-Sac prison policies about medication management when they were

highly relevant to multiple aspects of Coston's Eighth Amendment claims. These policies state that delivery of morphine must be done under "Direct Observation Therapy." They also outline a series of intermediary steps to be taken when a prisoner is noncompliant with medication and indicate that such steps should be taken prior to termination of the prescription. The proper procedure is to order medications in liquid form, or to crush tablets or capsules into water or juice, to ensure compliance. (2-ER-410.) It also describes that, when a patient is noncompliant, medical personnel may provide counseling to the patient, interview the patient to investigate the barriers to taking medication as prescribed, and adjust medication. (2-ER-411–14.) If these options are not successful, medical personnel may terminate medication, after the patient acknowledges in writing his refusal to take the medication. (2-ER-413–14.)

In Nangalama's own testimony, he stated that he would not usually discontinue medication completely. (1-ER-106–07.) The policy reinforces Nangalama's testimony and demonstrates that his termination of the morphine prescription was not only atypical, but also contrary to CSP-Sac policy and medically inappropriate. The policy also

59

speaks directly to the issue of Nangalama's mental state by showing that he knew alternatives existed to reduce the harm of withdrawal and the risks of Coston's ongoing, untreated pain. Thus, his choice to disregard those simple and effective options establishes his deliberate indifference.

The exclusion of the prison policy was also prejudicial because it prevented Coston from effectively rebutting Defendants' primary argument against liability: that their decision to terminate his medication was motivated by an appropriate response to legitimate security concerns. In this regard, the policy was relevant in two ways. First, as explained *supra* Section I.B-C, the "Direct Observation Therapy" policy, alone, would have resolved the alleged security issue presented by Defendants. The other alternative measures for compliance would have been equally effective in preventing any hoarding, and further prove that termination was unnecessary to ensure prison security.

Second, Hale's noncompliance with the security-oriented "Direct Observation Therapy" policy impeaches Defendants' claimed reliance on security concerns in terminating the prescription. Hale's practice of

60

violating the policy by leaving pills in Coston's cell supports the inference that Defendants were generally unconcerned with securing medication or that such a concern was secondary to other interests, such as convenience. Viewed in that light, the jury could conclude that the termination of Coston's medication was not based on Defendants' genuine security concerns but rather manifested a disinterest in complying with the more onerous measures dictated by the medication management policy. Prioritizing convenience, in violation of policy, over the health and welfare of inmates would support a jury finding of deliberate indifference.

**V.** **While each of the above errors supports reversal, their cumulative effect irrevocably prejudiced Coston's ability, as a pro se litigant, to present his Eighth Amendment claim.**

**A.** **A new trial is warranted where the cumulative effect of multiple errors impaired the fairness of the proceedings.**

Multiple errors committed by a lower court must be considered cumulatively. *See Jerden v. Amstutz*, 430 F.3d 1231, 1240-41 (9th Cir. 2005), *opinion amended on denial of reh'g*, No. 04-35889, 2006 WL 60668 (9th Cir. Jan. 12, 2006). Even if errors are harmless when considered individually, reversal is required when their cumulative

effect is prejudicial. *See Gordon Mailloux Enters., Inc. v. Firemen's Ins. Co. of Newark*, 366 F.2d 740, 742 (9th Cir. 1966).

The cumulative effect of multiple errors causes reversible prejudice when it "seriously impair[s] the fairness, integrity, or public reputation of judicial proceedings." *Hunt v. Rios*, 690 F. App'x 476, 478-79 (9th Cir. 2017) (citation omitted) (reversing based on the cumulative effect of multiple errors that seriously impaired the fairness of the prisoner plaintiff's civil rights trial, including improper jury instructions and foreclosing the pro se plaintiff's efforts to cross-examine a nonparty witness).

### B. The combined effect of the instructional and evidentiary errors deprived Coston of a fair trial.

As explained *supra* Sections I-IV, each of the errors raised in this appeal was individually prejudicial to Coston. Together, they stonewalled Coston's ability to present his case and rebut the evidence presented by the defense. This is because the errors related to the same central issues in the case and reinforced each other.

Throughout trial, the defense contended that their decision to abruptly discontinue Coston's morphine was (1) necessary as a security measure because Coston was hoarding pills and (2) medically

appropriate because he was not taking it, such that he suffered no harm as a result. (*See, e.g.*, 1-ER-212–13.)

The court's error in instructing the jury to defer to Defendants' security-based policies and practices made these contentions dispositive of the case. At the same time, the court erroneously deprived Coston of the very evidence that he would need to have any chance of rebutting either contention, namely the CSP-Sac prison management policy and Hale's testimony regarding his practice of leaving pills in Coston's cell.

Making matters worse, the district court compounded all of these errors by telling the jury that Defendants were absent because they were caring for loved ones and strangers in need. The cumulative effect was to magnify the prejudice caused by each of them individually and to direct the jury's verdict. Coston was entitled to a fair trial, but—for the second time—he did not receive one.

## CONCLUSION

For the foregoing reasons, Coston respectfully requests that this Court reverse the judgment and remand for a new trial.

November 13, 2020

**HORVITZ & LEVY LLP**
  BARRY R. LEVY
  EMILY V. CUATTO
**KAYE, MCLANE, BEDNARSKI & LITT, LLP**
  CAITLIN S. WEISBERG
**UCLA SCHOOL OF LAW NINTH CIRCUIT APPELLATE ADVOCACY PRISONERS' RIGHTS CLINIC**
  AARON LITTMAN
  ALBERTO DE DIEGO CARRERAS
  AMARIS MONTES


By:  _____ s/Emily V. Cuatto _____


Attorneys for Plaintiff-Appellant
**Daniel M. Coston**

64

## STATEMENT OF RELATED CASES

This Court heard a prior appeal in this matter: *Coston v. Nangalama*, No. 15-15397 (9th Cir.) (judgment entered Sept. 13, 2016).

### UNITED STATES COURT OF APPEALS
### FOR THE NINTH CIRCUIT
### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 19-16450

I am the attorney or self-represented party.

**This brief contains** | 12,158 | **words**, excluding the items exempted

by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R.

App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

⦿ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

○ is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one):*

   ○ it is a joint brief submitted by separately represented parties;

   ○ a party or parties are filing a single brief in response to multiple briefs; or

   ○ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated [   ].

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/Emily V. Cuatto     **Date** | November 13, 2020

*(use "s/[typed name]" to sign electronically-filed documents)*

Feedback or questions about this form? Email us at forms@ca9.uscourts.gov

**Form 08**            *Rev. 12/01/2018*